IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | | |
|---|---|---|---|
| IN RE: | § § | | EOD 04/14/2011 |
| **CHARLES D. DeLEON, JR.** | § | Case No. 09-10310 | |
| xxx-xx-7071 | § § | | |
| Debtor | § | Chapter 7 | |

| | | |
|---|---|---|
| JOHN GILBERT and BRENDA GILBERT | § § § | |
| Plaintiffs | § § | Adversary No. 09-1009 |
| v. | § § | |
| CHARLES D. DeLEON, JR. | § § | |
| Defendant | § | |

## **MEMORANDUM OF DECISION**[1]

This matter came before the Court for trial of the complaint asserted by the Creditor-Plaintiffs, John and Brenda Gilbert ("Plaintiffs"), who seek a determination of whether a debt owed to them by the Defendant-Debtor, Charles D. DeLeon, Jr. ("Debtor") is excepted from discharge pursuant to 11 U.S.C. §523(a)(2)(A). At the conclusion of the consolidated trial,[2] the Court took the matter under advisement. This

---

[1]This Memorandum of Decision is not designated for publication and shall not considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other evidentiary doctrines applicable to the specific parties in this proceeding.

[2] The trial of this matter was consolidated with the complaint asserted in adversary proceeding no. 09-1010 involving the same parties.

Memorandum disposes of all issues pending before the Court.[3]

## Factual And Procedural Background

For many years, W.C. (Sonny) and Elizabeth "Liz" Gilbert were siblings who owned a 730-acre ranch in western Jefferson County. For some 25 to 30 years, the Debtor-Defendant, Charles DeLeon, Jr., was employed by the Gilberts at the Gilbert Family Ranch. He lived adjacent to the Ranch and had primary responsibility for its maintenance as the ranch foreman. He was a loyal employee to the Gilberts and performed a number of additional duties as requested, particularly when the Gilberts entertained guests at the Ranch. As Mr. Gilbert's health declined, the Debtor willingly assisted Ms. Gilbert in the care of her brother so that he could continue to enjoy the Ranch though suffering with significant physical impairments. As a result, the Debtor enjoyed the favor of the Gilberts and, following Sonny Gilbert's death, Liz Gilbert promised the Debtor that he would be "well taken care of" financially as he approached retirement age and she promised financial assistance for the construction of a new home for his benefit. Specifically, the Debtor thought he would receive $50,000 from Ms. Gilbert's estate upon her death.

After Mr. Gilbert's death, Ms. Gilbert ultimately married a Mr. Fortune and relocated to Indianapolis, Indiana. She retained ownership of the Gilbert Family Ranch and the Debtor became its caretaker in her absence. Eventually the health of the former

---

[3] This Court has jurisdiction to consider the complaint pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a). The Court has the authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(I).

Ms. Gilbert declined. In those declining years, the last will and testament of Ms. Gilbert-Fortune changed frequently and soon the absolute legacy that the Debtor had been told to expect over the years evaporated to the point that the final will of Ms. Gilbert-Fortune provided that a $50,000 bequest to the Debtor would only be made if he was still employed at the Ranch at the time of her death. Perhaps not so coincidentally, the Debtor was terminated from his long-term employment at the Ranch only one week prior to her expected death at the direction of Ms. Gilbert-Fortune's Indiana business manager and trustee. At the termination meeting conducted by a local Beaumont attorney hired by the Indiana manager, the Debtor was convinced to take a $5,000 severance payment in exchange for the execution of a covenant not to sue. The Debtor therefore received no other distribution from Liz Gilbert-Fortune's estate upon her death.

Plaintiff John Gilbert III was Sonny and Liz Gilbert's first cousin once-removed.[4] Because he lived in the Houston area, he was often a guest at the Gilbert Ranch and he enjoyed a friendly relationship with Sonny and Liz Gilbert. John and his wife, Brenda, therefore had a reasonable expectation that John would also receive some significant distribution from the considerable Gilbert estate. However, the changes that occurred in Liz Gilbert-Fortune's will during her final years in Indiana also resulted in a considerable reduction in the size of the devise to John Gilbert. Due to the suspicious circumstances, he initiated litigation in Indiana upon Liz Gilbert-Fortune's death to contest the validity of

---

[4] The father of John Gilbert, III was a first cousin of Sonny and Liz Gilbert.

the will sought to be probated there.

At this point, the relationship between the Plaintiffs and the Debtor was a positive one. They would visit with each other during the Gilberts' visits to the Ranch. Indeed, the Debtor and his brother, Cardell DeLeon,[5] offered oral deposition testimony that supported the legitimacy of the Plaintiffs' position in the Indiana lawsuit. The lawsuit was eventually settled through mediation in mid-November 2003 and the Debtor and his brother were at the Gilbert ranchhouse with the Plaintiffs on the day that the litigation settlement was finalized, through which the Plaintiffs received ownership of the Ranch and significant cash considerations.[6]

Thus, upon final settlement of the Liz Gilbert-Fortune estate, the parties to this suit were in significantly contrasting positions. The Debtor was unemployed, having received only the $5,000 severance payment offered at the termination of his employment one week prior to Ms. Gilbert-Fortune's death. Conversely, the Plaintiffs were now the owners of the Ranch and the recipients of a significant cash infusion from that Estate. The Debtor admitted that he felt "left out" and was convinced that the estate

---

[5] Neither side called Cardell DeLeon to testify at trial. G. A. Wimberley described Cardell as a "self-promoting individual" who often pretended to exert more influence than he actually possessed. He was described as being much more ambitious and assertive than his brother, Charles. Ms. Gilbert characterized Cardell as a "slick operator" and a "con man." Though the Plaintiffs have asserted that the Debtor, Charles DeLeon, acted "in concert with" his more aggressive brother, John Gilbert acknowledged during his testimony that Cardell was "the dominant person of the two."

[6] The parties dispute whether the Debtor and his brother Cardell knew the terms of the probate settlement as they were being negotiated, terms which would become subject to a confidentiality agreement. The Debtor denies any such knowledge. Because of the confidentiality agreement, the precise scope of the bequest to the Plaintiffs by the Liz Gilbert-Fortune Estate was never quantified for the Court.

representatives in Indiana had betrayed the decedent's expressed intentions toward him for their own personal financial gain. John Gilbert candidly acknowledged at trial that the Debtor had not been treated right by those controlling the Liz Gilbert-Fortune estate and that he personally felt bad about that at the time.

Approximately two weeks after the will contest had been settled, on November 28, 2003, the DeLeon brothers and John Gilbert met at a Beaumont bank with a bank officer named G.A. Wimberley. The purpose of the meeting was facilitate the transfer by John Gilbert of $87,500 each to Charles DeLeon and Cardell DeLeon, respectively. Informed of the size of the proposed transfer, Wimberley advised Gilbert of possible tax consequences that could be imposed upon him personally if the transfer was structured as a gift. When Gilbert informed him that he anticipated eventually forgiving the amount, Wimberley offered general advice that any repayment could be systematically forgiven if the transfer was structured as a loan. Upon learning of such possible ramifications, Gilbert added the notation of "personal loan" to his two $87,500 checks that were then tendered to the Debtor and his brother, respectively. Although noted on the memo line as a loan, no promissory note was executed. No repayment schedule was agreed upon. John Gilbert testified that he thought at the time that the DeLeons would continue to work at the Ranch and that he anticipated forgiving much of that debt based upon such future work. However, he acknowledged that the Debtor had never agreed to continue working at the Ranch and he could not explain how any earned income would be likely be allocated or why the Debtor would have agreed in any event to supply ranch work, but

forego hourly wages in favor of credits on the obligation.

The motivations undergirding this financial transaction are now disputed by the parties. According to the Plaintiffs, the Debtor and his brother, Cardell, had represented that they were planning to bring an "insider trading" suit against the Liz Gilbert-Fortune Estate, based upon certain confidential stock information that Charles had purportedly heard Liz Gilbert-Fortune disclose to certain friends during a party at the Gilbert Ranch. This litigation would purportedly recoup some of the moneys that should have rightfully come to Charles from the Gilbert-Fortune estate. The Plaintiffs claim that Cardell was constantly urging them to settle their will contest litigation quickly because the "whistleblower" suit was so serious that it would likely hold up any distribution from that estate, including any proposed payment to John and Brenda Gilbert, for a significant period of time. Cardell had allegedly bragged to the Plaintiffs that Walter Umphrey, a prominent Beaumont litigator, was representing the DeLeons in their future action against the estate and the Plaintiffs contend that both brothers asked for a "loan" from the Gilberts so that they could pay accrued attorneys' fees allegedly due and owing at that time to the Umphrey law firm on their lawsuit. The Plaintiffs contend that the Debtor was a quiet accomplice to these aggressive assertions by his brother and that he never contradicted any of Cardell's threats or representations.

Alternatively, the Debtor contends that the money was always intended to be a gift from the Gilberts out of the settlement amount that they received from the Gilbert-Fortune estate. According to the Debtor, the Gilberts agreed with his assessment that he had been

-6-

cheated out of what Liz Gilbert-Fortune had intended to provide for him and that the transfer fulfilled John Gilbert's expressed desire to rectify that injury and "reconcile the Gilbert name with the DeLeons." The Debtor admitted that he had done nothing to deserve such consideration, that he never possessed an intention to repay any amount since he thought it was a gift, and that, at the time, it was essentially a honorable and charitable act by the Gilberts.

Some discussions occurred over the next few months regarding a continuing role for the Debtor at the Ranch. However, none came to fruition and those possibilities came to an abrupt halt when the Debtor invited Brenda Gilbert in February 2004 to attend a meeting in the offices of attorney Douglas Sikes at the Umphrey law offices in Beaumont. The topic of the meeting was not disclosed. Ms. Gilbert anticipated a discussion regarding the "insider trading" suit. However, the purpose of the meeting was to discuss the Debtor's opportunity to pursue further compensation from the Gilbert-Fortune decedent's estate for the wrongful termination of his employment.[7] When Ms. Gilbert subsequently asked about the prosecution of an insider trading claim at the end of the meeting, she learned that no such lawsuit existed nor contemplated.

The Debtor never performed further work at the ranch and eventually the Plaintiffs made a demand upon him and his brother for repayment of the advanced sums. When no such payment was received nor any other accommodation reached, the Plaintiffs initiated

---

[7] Upon learning that the Debtor had previously accepted a $5,000 payment and executed a release, the attorney advised the Debtor that he had no legal recourse for such relief.

litigation against the Debtor and his brother in the County Court at Law #1 in Jefferson County, Texas.[8] The jury in that action found that the November 2003 transaction constituted a no-interest loan from the Gilberts to the Debtor[9] and the Court issued a judgment on March 2, 2009 that awarded judgment in favor of the Plaintiffs against this Debtor in the amount of $87,500.00, plus attorneys' fees and post-judgment interest.[10] The Debtor subsequently filed a voluntary petition for relief under Chapter 7 on June 12, 2009, and this adversary proceeding ensued.

## Discussion

In an action to determine the dischargeability of a debt, the creditor has the burden of proof under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *FNFS, Ltd. v. Harwood (In re Harwood)*, 2011 WL 1239810, at *3 (5th Cir. Apr. 5, 2011) (citing *Hudson v. Raggio & Raggio, Inc. (In re Hudson)),* 107 F.3d 355, 356 (5th Cir. 1997). Thus, without satisfactory proof of each element of the cause of action pled, judgment must be entered for the debtor.

---

[8] Plaintiffs' Ex. C.

[9] Plaintiffs' Ex. H.

[10] Plaintiffs' Ex. J.

The fact that there is a debt owing by the Defendant to the Plaintiffs is established through the factual findings issued in the state court litigation between the parties.[11] However, this Court retains exclusive jurisdiction to determine whether that debt is dischargeable. *Grogan v. Garner*, 498 U.S. 279, 285, n.11, (1991); *Fielder v. King (Matter of King),* 103 F.3d 17, 19 (5th Cir. 1997).

The Plaintiffs allege that such debt should be excepted from discharge as a debt obtained by a false representation or under false pretenses. 11 U.S.C. §523(a)(2)(A) provides that:

> a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or services, . . . to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

Section 523(a)(2)(A) encompasses similar but distinct causes of action. Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[12] the Fifth

---

[11] "Collateral Estoppel or, in modern usage, issue preclusion, means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Schiro v. Farley*, 510 U.S. 222, 232, (1994) (internal quotations omitted). Because the judgment against the Defendant was entered in a Texas state court, this Court applies the Texas law of issue preclusion. *In re Pancake*, 106 F.3d 1242, 1244 (5th Cir. 1997); *In re Gober*, 100 F.3d 1195 (5th Cir. 1996). Under Texas law, a party is collaterally estopped from raising an issue when: (1) the facts sought to be litigated in the second case were fully and fairly litigated in the first; (2) those facts were essential to the prior judgment; and (3) the parties were cast as adversaries in the first case. *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex. 1984), *Cannon v. Texas Independent Bank*, 1 S.W.3d 218, 224 (Tex. App. – Texarkana 1999, pet. denied).

[12] *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987). Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351(1995), in support of their proposition that all of the §523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v.*

Circuit has distinguished the elements of "actual fraud" and of "false pretenses and false representations." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995). The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event as opposed to a representation regarding a past or existing fact. *Bank of Louisiana v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991) ["In order . . . to be a false representation or false pretense under § 523(a)(2), the false representations and false pretenses [must] encompass statements that falsely purport to depict current or past facts. [A debtor's] promise ... related to [a] future action [which does] not purport to depict current or past fact . . . therefore cannot be defined as a false representation or a false pretense"].

While "false pretenses" and a "false representation" both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement. *See Walker v. Davis (In re Davis),* 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); and *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003). "In order for the court to deny

---

*Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT& T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was actually distinguishing the language used in §523(a)(2)(A) from that utilized in §523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A). Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of reliance in actual fraud cases to cases of false pretense or false representation, 516 U.S. at 71, n. 8, the statement that the Court erased all distinctions between the three (a)(2)(A) actions is overstated.

discharge of a debt under section 523(a)(2)(A) on the basis that the debt was procured by false pretenses or a false representation, the plaintiff must prove by a preponderance of the evidence that the debtor made representations that were (1) knowing and fraudulent falsehoods, (2) describing past or current facts, (3) that were relied upon by the other party." *Mosiman v Warren (In re Warren)*, 2010 WL 2640267, at *2 (Bankr. N.D. Tex., June 29, 2010) (*citing Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992).[13]

The Court finds that the Plaintiffs have failed to sustain their burden of proof that the Debtor induced them to make the loan to him under false pretenses or through any misrepresentation. The tendered evidence fails to provide any corroboration of the version of events proffered by the Plaintiffs. There is no note or other documentation setting forth the purpose of the loan. Indeed one wonders, if the loan was procured under false pretenses or upon a misrepresentation regarding an insider trading lawsuit, why the Debtor would have, on his own initiative, invited Brenda Gilbert to a meeting with his lawyers at which his invidious fraud could be easily exposed. The only evidence from an independent source regarding the funding of the loan came from G.A. Wimberley, the

---

[13] A debt may also be declared nondischargeable if it was obtained by actual fraud. To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained losses as a proximate result of the representations. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995), *as modified by the United States Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

banker that witnessed the event. His descriptions of the parties' conduct on that date belies the contention that the loan was funded based upon any misrepresentation regarding a lawsuit or to address the accrual of any outstanding attorneys' fees obligations by the Debtor. Indeed, the Plaintiffs' own evidence belies that conclusion.

On June 21, 2004, the Plaintiff, John Gilbert, personally sent a demand letter to the Debtor.[14] This occurred approximately seven months after the funding of the loan and four months after the discovery by Ms. Gilbert of the purported fraud regarding the insider trading lawsuit. Yet, strangely enough, there is absolutely no mention of fraud, attorneys' fees, insider trading lawsuits, discovery of hidden agendas or misinformation, or any other misrepresentation other than the slight inference that the Gilberts presumed that the Debtor would return to work at the ranch. Specifically, the letter states, in relevant part:

> Dear Charles,
>
> As you recall, at the end of 2003, my wife and I agreed to loan you and your brother Cardell the total sum of $175,000 or $87,500 each. *The loan was made to assist you in helping to defray the cost of your mortgage and to assist Cardell in funding some of his ongoing endeavers* (sic).[15]
>
> This money was also loaned based on your long standing relationship with my family, the deep relationship of trust that had been established, your promise that you and Cardell would continue to help me and my wife run the Gilbert Family Ranch, and other representations.

---

[14] Plaintiffs' Ex. B.

[15] *Id.* (emphasis added).

> That help has been conspicuously absent, in fact, we have scarcely seen either one of you at all. Additionally, Cardell's previously described endeavers (sic) which he needed help in funding seem to have not materialized.
>
> It has now been some six months after the loan was made, and I have yet to see any repayment or even any mention made of it. As such, I must now make demand for the repayment of the loan.

The Plaintiff's own statements regarding the purpose of the loan and the motivations behind it, asserted long after the supposed fraud had been "discovered," are consistent with the environment described by independent sources at the time the loan was made. It, in fact, corroborates the Debtor's testimony that the transaction was motivated primarily by friendship and by Gilbert's desire to atone for the mistreatment of the Debtor inflicted at the hands of the Gilbert-Fortune estate representatives — not by a purported misrepresentation or disguised falsehood by the Debtor.

Because the Court concludes that the Plaintiffs have failed to prove their cause of action by a preponderance of the evidence, judgment must be rendered for the Debtor in this action. This memorandum of decision constitutes the Court's findings of fact and conclusions of law[16] pursuant to Fed. R. Civ. P. 52, as incorporated into adversary

---

[16] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

proceedings in bankruptcy cases by Fed. R. Bankr. P. 7052. An appropriate judgment will be entered which is consistent with this opinion.

Signed on 04/14/2011

_____
THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE